**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:23-cr-16 (JEB)** |
| **v.** | : | |
| | : | |
| **FRANK ROCCO GIUSTINO,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Frank Giustino to 21 days of incarceration, 36 months of probation, 60 hours community service, and $500 in restitution.

### I.        Introduction

The defendant, Frank Giustino, a 32-year-old massage therapist who lives in Long Island, New York, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Giustino pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating or Picketing in the Capitol Building. As explained herein, a period of incarceration

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

is appropriate in this case because Giustino: (1) approached the Capitol building in the afternoon of January 6 despite observing armed police guarding the building, flashbang grenades exploding, and tear gas choking the air; (2) aggressively confronted police prior to entering the Capitol; (3) entered the Capitol at approximately 2:16 p.m. through the Senate Wing Door, three minutes after other rioters broke open this door and shattered the nearby windows in the initial breach of the Capitol at approximately 2:13 p.m.; (4) spent approximately 35 minutes inside the Capitol during the riot; (5) joined the crowd that surged past police officers trying to hold back the rioters in the Crypt; and (6) loitered and chanted in the Rotunda for 17 minutes.

The Court must also consider that Giustino's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. The facts and circumstances of Giustino's crime support a sentence of 21 days incarceration as both necessary and appropriate in this case.

**II.      Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense.

*Giustino's Role in the January 6, 2021 Attack on the Capitol*

Giustino's Facebook account reveals he was preoccupied with the conspiracy theories surrounding the 2020 Presidential Election, posting about it daily. For example, on November 8, 2020, Giustino posted, "can't comment on that but the entire election was going to (be) fixed in this way. I don't believe the votes, ever."

Giustino traveled on a bus from his home on Long Island to Washington, D.C. on January 6, 2021 to attend the "Stop the Steal" rally after publicly posting his decision to attend on Discord, an instant messaging social media platform where users have the ability to communicate with voice calls, video calls, text messaging, media and files in private chats or as part of communities called "servers."  Giustino posted on Discord under the username "President-Elect Frankie G"[2] in the runup to January 6, noting that he would travel to D.C. by bus and indicating that he would post his activities on January 6 to "the gram" (or Instagram).

Giustino also regularly posted on Facebook, including a post at approximately 5:28 a.m. on January 6 announcing that he was en route to D.C. Giustino arrived in Washington, D.C. at approximately 8:45 a.m. on January 6 wearing a gray hooded sweatshirt, black pants, and a red baseball cap over a black head covering.  Demonstrating his focus on the certification taking place at the Capitol, Giustino posted on Facebook, "Rumor is Pence will be (sic) betray Trump."

While walking to the Capitol on January 6, Giustino continued posting regular updates on his actions and observations, including the below posts to Discord:



---

[2] Giustino acknowledged his Discord handle in a Facebook post on January 15, 2021.

3

One such update Giustino posted on Facebook at approximately 1:42 p.m., prior to his entering the Capitol, made clear that Giustino knew how unwelcome he and the other rioters were:



Rather than being horrified at the site of rioters attacking the Capitol, and despite being tear gassed, Giustino's opinion of the battleground scene at the Capitol's West Front was, "this is FUCKING awesome":



Undeterred by either these observations or the tear gas, and jubilant in his surroundings, Giustino pressed forward toward the Capitol building, arriving at the northwest corner at approximately 2:00 pm.  There, a platoon of Metropolitan Police Department (MPD) officers was arriving to assist the besieged Capitol Police.  As Giustino watched, the officers ran a gauntlet of rioters yelling at, charging at, and assaulting them while a siren blared. For his part, Giustino let them know they were in danger of injury, screaming in an officer's face, "We don't want to hurt

you.  We don't.  We don't. Stop, please," harassing police in an attempt to get them to abandon their mission of securing the Capitol:



*Figure 1: Screenshot from Exhibit 1, at: 1:19*

Giustino approached and entered the Senate Wing Door at approximately 2:16 pm, just three minutes after the initial breach of the Capitol building at this location:



*Figure 2: Screenshot from Exhibit 3, at: 1:16*



*Figure 3: Screenshot from Exhibit 3, at: 1:29*

Giustino initially turned left toward the Senate Wing of the Capitol, before returning to the Senate Wing Door and proceeding to the Crypt. There, U.S. Capitol Police had formed a line of officers blocking the rioters from advancing further into the building. But rioters continued streaming into the Crypt, quickly outnumbering the officers and pushing past them. Though not at the front, Giustino formed part of this critical mass:



*Figure 4: Screenshot from Exhibit 4, at: 3:22*

Once the crowd overwhelmed Capitol Police in the Crypt, Giustino proceeded into the

Small House Rotunda and took stairs up to the Capitol's second level:



*Figure 5: Screenshot from Exhibit 5, at: 1:24*

Giustino entered the Rotunda at approximately 2:34 pm:



*Figure 6: Screenshot from Exhibit 6*

Giustino spent approximately the next 17 minutes in and around the Rotunda, participating

in at least one chant while tear gas filtered into the Rotunda:



*Figure 7: Screenshot from Exhibit 7, at 4:20*

At approximately 2:51 p.m., Giustino exited the Capitol through the East Rotunda Doors:



*Figure 8: Screenshot from Exhibit 8, at 18 seconds*

Giustino summed up January 6 with this post to Facebook at approximately 4:11 p.m.:



In total, Giustino spent approximately 35 minutes inside of the Capitol.

In the aftermath of January 6, Giustino celebrated and defended his and other rioters'
actions.   On January 7, Giustino compared the attack on the Capitol to Black Lives Matters
protests, with a Facebook meme of a tweet from January 6 that read, "If you refused to condemn
the violent looting across America this summer then I'm not interested in hearing from you today."
He posted a second meme on Facebook that day to justify the violent riot against the Capitol that

read, "#Electionfraud has been taking place by BOTH parties for a VERY long time. Without fair elections, there IS no America and the Capitol means nothing."

*The Charges and Plea Agreement*

On January 3, 2022, the United States charged Giustino by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 11, 2022, he was arrested on Long Island, New York. On January 11, 2023, the United States charged Giustino by a four count Information with violating the same statutes. On February 1, 2023, pursuant to a plea agreement, Giustino pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building. By plea agreement, Giustino agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Giustino now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Giustino faces up to six months of imprisonment, up to five years of probation, and a fine of up to $5,000. Giustino must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 21 days of incarceration and 36 months of probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Giustino's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Giustino the absence of violent or destructive acts is not a mitigating factor. Had Giustino engaged in such conduct, he would have faced additional criminal charges.

Giustino entered the Capitol through the Senate Wing Door just three minutes after rioters violently breached the building for the first time that day.  Before Giustino made the decision to approach the door, he posted on social media that police were using tear gas against him and the other rioters, condescendingly calling law enforcement "civil servants," an affront to the hundreds of officers injured that day protecting democracy.  During his approximate 35 minutes inside the Capitol, Giustino travelled through the Senate Wing, Crypt, Small House Rotunda, Rotunda and East Rotunda Lobby.  He was part of the mob in the Crypt that overwhelmed the last line of police officers.  Accordingly, the nature and the circumstances of this offense reflect a need for a period of incarceration.

### B.  Giustino's History and Characteristics

As set forth in the PSR, Giustino has an associate degree, has no history of substance abuse, and no criminal history. ECF No. 33, ¶¶ 48-49, 28-30. He appears to have been compliant with his conditions of pre-trial release.  *Id.* at ¶ 9.  He has been unemployed since 2020.  Giustino has

reported a number of health conditions, but none of these conditions prevented him from travelling to Washington, D.C. or from proceeding through police and tear gas to enter the Capitol.

Considering his lack of criminal history and his post-arrest conduct, the government requests a 21-day period of incarceration and 36 months' probation.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### 1.  General Deterrence

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

## 2.    *Specific Deterrence*

The government acknowledges that Giustino accepted responsibility for his actions. But nothing in the record suggests that he has abandoned the false narrative regarding a stolen election, or that he would not take similar actions in the future.  In the aftermath of January 6, Giustino defended his and other rioters' actions and compared the attack on the Capitol to Black Lives Matters protests, and continued to comment on election fraud in the days following the riot. Additionally, on September 16, 2021, Giustino posted a "selfie" photograph on Instagram that he edited to include the text, "Doctors HATE him.  Governments tremble in fear."  Nine months after

storming the citadel of democracy, Giustino's self-aggrandizing boast still showed a lack of respect for government and a lack of remorse for his actions on January 6. Giustino's post January 6 conduct thus demonstrates the need for specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Giustino based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Giustino has pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building. This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases,

even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory

16

range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although the defendants discussed below participated in the Capitol breach on January 6, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the specific blend of aggravating and mitigating circumstances and defendant characteristics present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Rafael Valadez*, Case No.21-cr-695 (JEB), this Court imposed a sentence of 30 days' imprisonment. Like Giustino's posts to social media as he was marching on the Capitol describing being hit with tear gas and mocking police as "nice civil servants," Valadez posted videos expressing approval of the Capitol breach. Giustino, like Valadez, celebrated the violence, in Giustino's case by posting that it was "fucking awesome." Even worse, Giustino implicitly threatened police officers that they would be hurt if they continued defending the Capitol, telling them, "we don't want to hurt you," and thereby implying that the crowd *would* hurt

the police if the officers did not stop.  As had Valadez, Giustino entered the Senate Wing Doors minutes after other rioters had violently breached the doors.  Like Valadez, Giustino was part of a group of rioters who pushed past a severely outnumbered group of police officers in the Crypt. Inside the Capitol, Valadez continued to take video of and celebrate the riot.  Valadez doubled down a month after the riot on his claims that the riot was justified by posting, "this country needs to be brought to its knees." Similarly, Giustino made social media statements the next day that minimized the violence and tried to justify the riot.

In *United States v. Russell Peterson*, No. 21-cr-00309 (ABJ), the defendant, like Giustino, entered through the Senate Wing door. Like Peterson, Giustino posted on social media about his participation in the events. Like Peterson, Giustino entered the Capitol once. Like Giustino, Peterson pleaded guilty to violating Section 5104(e)(2)(G). Judge Berman Jackson sentenced Peterson to 30 days' incarceration.  *Id.* ECF No. 35.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[4]

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Frank Rocco Giustino to 21 days of incarceration, 36 months of probation and $500 in restitution. Such a sentence protects the

---

[4]  Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

community, promotes respect for the law, and deters future crime by imposing restrictions on his

liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his

crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      */s/ Douglas G. Collyer*
DOUGLAS G. COLLYER
NDNY Bar No. 519096
Assistant United States Attorney
U.S. Attorney's Office
14 Durkee Street, Suite 340
Plattsburgh, New York 12901
Office: 518-314-7800
Douglas.Collyer@usdoj.gov